108 T.C. No. 9

UNITED STATES TAX COURT

GENERAL DYNAMICS CORPORATION AND SUBSIDIARIES, Petitioner
v. COMMISSIONER OF INTERNAL REVENUE, Respondent

GENERAL DYNAMICS FOREIGN SALES CORP., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 19202-94, 19203-94.        Filed March 26, 1997.

P formed wholly owned corporations (one a DISC, the other an FSC). P computed and reported its Federal income using the completed contract method. P elected, under sec. 1.451-3(d)(5)(iii), Income Tax Regs., to annually deduct certain period costs. In computing the base (combined taxable income) for the statutorily conferred tax benefit to promote exports, P did not account for period costs, which it had elected to deduct annually in prior years. R determined that sec. 994 and/or 925, I.R.C., and the regulations thereunder, required P to include prior years' period costs that are attributable to the gross receipts from foreign exports in computing the base for P's deferral or exemption from income.

P manufactured specialized ocean-going vessels for the transport of liquefied natural gas. Sec. 1.993-3(d)(2)(i)(b), Income Tax Regs., requires that to

generate qualified export receipts the export property must be used in foreign commerce prior to 1 year after its sale.  For reasons beyond P's control the vessels were not so used.  P contends that the regulation is not a proper interpretation of the statutory provision.

<u>Held</u>:  Sec. 1.994-1(c)(6), Income Tax Regs., interpreted to require P to reduce gross export receipts by related period costs even though P is permitted to elect to deduct those costs in years prior to the combined taxable income computation.

<u>Held</u>, <u>further</u>, P's vessels are not qualified export property because they fail to meet the requirements of sec. 1.993-3(d)(2)(i)(b), Income Tax Regs.  <u>Sim-Air, USA, Ltd. v. Commissioner</u>, 98 T.C. 187, 190-197 (1992), followed in upholding the validity of the regulation.


<u>David C. Bohan</u>, <u>Richard T. Franch</u>, <u>James M. Lynch</u>, <u>Philip A. Stoffregen</u>, <u>David D. Baier</u>, <u>Scott Schaner</u>, <u>Gregory S. Gallopoulos</u>, and <u>Debbie L. Berman</u>, for petitioner in docket No. 19202-94.

<u>David C. Bohan</u>, <u>James M. Lynch</u>, <u>Philip A. Stoffregen</u>, and <u>David D. Baier</u>, for petitioner in docket No. 19203-94.

<u>William H. Quealy, Jr.</u>, <u>Alice M. Harbutte</u>, <u>Jeffrey A. Hatfield</u>, <u>Thomas C. Pliske</u>, and <u>William T. Derick</u>, for respondent.


GERBER, <u>Judge</u>:  General Dynamics Corp. and its consolidated subsidiaries (GENDYN) (docket No. 19202-94) and its foreign sales corporation, General Dynamics Foreign Sales Corp. (GENDYN/FSC) (docket No. 19203-94), are petitioners in these consolidated cases.  Respondent determined corporate income tax deficiencies

for GENDYN in the amounts of $26,118,976 and $291,218,973 for its 1985 and 1986 taxable years, respectively. With respect to GENDYN/FSC, respondent determined a $586,533 corporate income tax deficiency for its 1986 taxable year. Although these cases are consolidated and related, for purposes of briefing and opinion the issues have been divided into two generalized categories: Domestic and foreign. This opinion addresses the foreign issues.

The parties have settled some of the foreign issues, and the following controversies remain for our consideration and decision: (1) Whether in computing combined taxable income attributable to qualified export receipts under sections 994[1] and 925 petitioners must, in addition to current year period costs, deduct prior year period costs, as determined by respondent; and (2) whether two liquefied natural gas tankers manufactured by petitioner and sold to an unrelated third party for foreign use constitute export property under section 993(c)(1) even though no foreign use occurred during the first year and/or domestic use occurred on one occasion prior to any foreign use.

FINDINGS OF FACT

The parties have stipulated most of the facts bearing on the foreign issues, and those facts are found and incorporated by this reference. GENDYN was incorporated on February 21, 1952,

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code as amended and in effect for the taxable years in issue.

and, at all relevant times, was the common parent of a group of corporations that filed consolidated corporate Federal income tax returns. At the time the petitions were filed in these cases, GENDYN's and GENDYN/FSC's principal places of business were in Falls Church, Virginia. GENDYN engineered, developed, and manufactured various products for the U.S. Government and, to a lesser extent, foreign governments, including military aircraft, missiles, gun systems, space systems, tanks, submarines, electronics, and other miscellaneous goods and services. GENDYN was also involved in business activities, including design, engineering, and manufacture of general aircraft; mining coal, lime, limestone, sand, and gravel; manufacture and sale of ready-mix concrete, concrete pipe, and other building products; production of commercial aircraft subassemblies; design, engineering, and manufacture of commercial space launch vehicles and services; and shipbuilding. GENDYN, for the taxable years 1977 through 1986, used the completed contract method to report Federal income and the percentage of completion method for its financial accounting purposes.

GENDYN, on February 25, 1972, incorporated an entity (GENDYN/DISC)[2] to serve as an export sales representative.

---

[2] The issues in these consolidated cases span a time period within which the statutory provisions relating to domestic international sales corporations were replaced by those related to foreign sales corporations. Due to these statutory changes, GENDYN ended use of its specially formed domestic international
(continued...)

GENDYN owned 100 percent of GENDYN/DISC's sole class of voting stock.  GENDYN/DISC had no employees or business operations and existed for the sole purpose of receiving commissions from GENDYN.  On the date of the incorporation, GENDYN and GENDYN/DISC entered into an Export Sales Commission Agreement.  On May 24, 1972, GENDYN/DISC elected to be treated as a domestic international sales corporation (DISC) under section 992(b), and it filed Federal income tax returns (Forms 1120-DISC) on the basis of a fiscal year ended March 31.

GENDYN/DISC, through the period ended December 31, 1984, reported the commissions it earned on GENDYN's sales of export property based on the completed contract method of accounting in accordance with section 1.993-6(e)(1), Income Tax Regs.

At the end of each year, commissions on export property sales involving long-term contracts were deducted by GENDYN and included in income by GENDYN/DISC in its appropriate taxable period.  Commissions were normally computed under the 50-50 combined taxable income method (50-percent method) provided for

---

[2](...continued)
sales corporation and began use of a foreign sales corporation. Although some differences exist between the two sets of statutory provisions and the entities created to comply with the statutes, for purposes of resolving the issues in this case we need not make any distinctions.  The foreign sales corporation became a petitioner in these consolidated cases because it was the surviving entity.  Accordingly, the domestic international sales corporation will be referred to as GENDYN/DISC and the foreign sales corporation will be referred to as GENDYN/FSC.  When referred to generally, they will be referred to, along with the other entities collectively, as petitioners.

in section 994 because that method yielded the largest commission.  On certain rare occasions, the 4-percent gross receipts method of section 994 was utilized.

Petitioners computed combined taxable income for each long-term contract under the 50-percent method, as follows:

(a)  Add:  gross receipts from the contract as determined under the completed contract method of accounting;

(b)  Less:  direct costs allocated to the contract under section 1.451-3(d)(5)(i), Income Tax Regs.;

(c)  Less:  indirect costs allocated to the contract under section 1.451-3(d)(5)(ii), Income Tax Regs.;

(d)  Less:  period costs incurred in the year of completion allocated to the contract under section 1.451-3(d)(5)(iii), Income Tax Regs.

In computing combined taxable income, petitioners did not make a reduction for period costs, as defined in section 1.451-3(d)(5)(iii), Income Tax Regs., incurred and allocated to the contract prior to the year of contract completion.  Respondent determined that petitioners incorrectly computed combined taxable income under the 50-percent method.  In particular, respondent determined that petitioners were required to aggregate and deduct, in the year of completion of each long-term contract, all period costs allocated to the contract, including those deducted for prior years.

GENDYN/DISC ceased performing as GENDYN's commission agent on December 31, 1984, and was dissolved on October 23, 1992.

On December 27, 1984, GENDYN incorporated petitioner General Dynamics Foreign Sales Corp. (GENDYN/FSC) in the U.S. Virgin Islands to serve as GENDYN's export sales representative. GENDYN owned the sole class of voting stock and entered into a Foreign Sales Commission Agreement with GENDYN/FSC. On March 22, 1985, GENDYN/FSC elected under section 927(f) to be treated as a foreign sales corporation (FSC). During 1985 and 1986, GENDYN/FSC functioned as GENDYN's export sales representative and was involved in no other trade or business. GENDYN/FSC filed Federal Forms 1120-FSC and used the completed contract method of accounting to report the commissions earned on GENDYN's sales of export property involving long-term contracts.

At the end of each year, commissions on export property sales involving long-term contracts were deducted by GENDYN and included in income by GENDYN/FSC in its appropriate taxable period. With rare exceptions, the 23-percent combined taxable income method (23-percent method) was used because it produced the largest commission. In a few instances, the 1.83-percent gross receipts method was used.

Petitioners computed combined taxable income for each long-term contract under the 23-percent method as follows:

(a) Add: gross receipts from the contract as determined under the completed contract method of accounting;

(b) Less:  direct costs allocated to the contract under section 1.451-3(d)(5)(i), Income Tax Regs.;

(c) Less:  indirect costs allocated to the contract under section 1.451-3(d)(5)(ii), Income Tax Regs.;

(d) Less:  period costs incurred in the year of completion allocated to the contract under section 1.451-3(d)(5)(iii), Income Tax Regs.

In computing combined taxable income, petitioners did not make a reduction for period costs incurred prior to the year of contract completion that had been allocated to the contract in years prior to completion under section 1.451-3(d)(5)(iii), Income Tax Regs.  Respondent determined that petitioners incorrectly computed combined taxable income under the 23-percent method.  In particular, respondent determined that petitioners, in the year of completion of each long-term contract, were required to aggregate all period costs allocated to the contract, including those deducted for prior years, and reduce combined taxable income by the aggregated amount.

Respondent also determined that GENDYN was not entitled to deduct commissions on sales involving two ships because they did not qualify as export property under section 993.  In the alternative, if the ships are found to qualify as export property under section 993, respondent determined that petitioners incorrectly computed the commissions attributable to the ships, in the same manner as described above.

Pantheon, Inc. (Pantheon), is a wholly owned domestic subsidiary of GENDYN. Pelmar Co. (Pelmar) and Morgas, Inc. (Morgas), are wholly owned domestic subsidiaries of corporations unrelated to petitioners. On May 7, 1976, Pantheon, Pelmar, and Morgas formed the Lachmar Partnership (Lachmar), a general partnership. Pantheon and Pelmar each owned 40 percent, and Morgas owned the remaining 20 percent of Lachmar. Lachmar was organized for the purpose of purchasing, owning, and operating two specialized vessels (LNG tankers) that were designed and built for transoceanic transport of liquefied natural gas (LNG).

LNG is made by cooling natural gas to a temperature below minus 256 degrees Fahrenheit. It is then transported at that temperature in special-purpose tankers. After delivery from the tankers, the LNG is returned to a state in which it can be distributed through pipelines. The construction of LNG tankers incorporates specialized and expensive technology which when installed in a tanker renders it economically unusable for other transportation purposes. Due to the cost to specially build them and the lack of economically feasible convertibility, LNG tankers are normally constructed for well-defined long-term projects, and there is virtually no open market for LNG tankers.

There are four LNG terminals within the contiguous United States and one in Alaska, all of which are capable of landing and receiving the type of LNG tanker under consideration in this case. Throughout the period under consideration, it was not

economically suitable to ship LNG between Alaska and the other four domestic locations. Throughout the period under consideration, it was not economically suitable to domestically ship LNG where it is accessible in gas form through a pipeline.

Trunkline LNG Co. (Trunkline), a wholly owned subsidiary of Pelmar's parent, was organized to purchase LNG from Algeria and to arrange for its transportation to Lake Charles, Louisiana, for U.S. distribution. On September 17, 1975, Pelmar's parent entered a contract (LNG contract) with an Algerian national gas producer to purchase 7,700,000 cubic meters of LNG annually for 20 years. The purchaser was required to provide trans-Atlantic transportation for 3,200,000 cubic meters of LNG each year. On January 2, 1976, the contract rights and obligations were assigned to Trunkline.

Trunkline contracted with Lachmar (transportation contract), on May 7, 1976, to transport LNG from Algeria to Louisiana over a 20-year period beginning in the first quarter of 1980. On May 7, 1976, Lachmar entered into two contracts with GENDYN for the construction and purchase of two LNG tankers to transport the LNG. Because of the combined 60-percent control by Morgas and Pelmar, GENDYN did not control Lachmar, so the transactions between GENDYN and Lachmar were on an arm's-length basis. GENDYN manufactured the LNG tankers in the ordinary course of its business for sale to Lachmar. The LNG tankers were to be delivered on December 4, 1979, and March 18, 1980. On May 7,

1976, Lachmar entered into a contract with an affiliate of Morgas to oversee the construction and then to maintain and operate the LNG tankers.

Bonds, guaranteed by the U.S. Government, were issued by Lachmar to finance the construction of the tankers, and the Federal Government also subsidized the construction of the tankers. A portion of the subsidy was eventually repaid to the Federal Government because one of the tankers was used for domestic transportation. The tankers were delivered and transferred to Lachmar on May 15 and September 25, 1980. Morgas' affiliate was prepared to begin transportation of LNG at the time of the tankers' delivery.

To satisfy its obligations under the LNG contract, the Algerian national LNG company was to construct a terminal facility for the tankers. For technical, financial, and political reasons, the facility was not completed until the fall of 1982, and the Algerian company could not deliver sufficient quantities of LNG to fulfill its obligations to Trunkline. Accordingly, the initial uses of the LNG tankers outside the United States were on September 3 and November 16, 1982, respectively. Prior to that time, Lachmar bore the expense of storing the tankers at various locations.

During 1980 through 1982, there was overcapacity in the world market for LNG tankers, and Lachmar was able to find only limited use for the tankers prior to their use under the

transportation contract.  That use occurred between June and July of 1981, when one of the tankers transported LNG from Everett/Boston, Massachusetts, to Elba Island, Georgia.  The LNG being transported was originally from Algeria.  For that transportation, Lachmar received gross compensation of $2,038,468, which resulted in a gross profit of $588,228.  The $2,038,468 was paid $1,349,581 in 1981 and $688,887 in 1982.  Due to the domestic use of one of the tankers, Lachmar obtained an exception from the Federal Government; otherwise it would have risked losing all of its Government subsidies.  The two tankers made voyages between Algeria and Louisiana a total of four times during 1982 and seven times during 1983 under the transportation contract.  Thereafter, the LNG and transportation contracts were breached, and the tankers were stored in Virginia until 1988 and 1989, at which time they no longer belonged to Lachmar and began service transporting LNG in foreign commerce.

On Lachmar's Federal partnership returns, for purposes of claiming credits and depreciation allowances, Lachmar reported that one of the tankers was placed in service in 1980 and the other in 1981.  Respondent questioned the placed-in-service dates reported by Lachmar, and after the tax audit, the parties agreed that one tanker was placed in service on January 1, 1981, and the other on July 1, 1981.

OPINION

The issues under consideration arise in connection with GENDYN and its foreign sales corporations.  One issue concerns the manner in which petitioners compute the amount of commission income that may be deferred or excluded under the foreign sales corporation statutes and regulations.  That issue is one of first impression, involving the interpretation of certain statutes and regulations.  The other issue concerns whether either of two ships is export property under section 993(c)(1) so as to enable petitioners to include it in the computation of commission income under the foreign sales corporation statutes and regulations.  We first consider the former issue.

I.  Petitioners' Treatment of Period Costs in Computing Combined Taxable Income

Petitioners were on the completed contract method of accounting for long-term contracts for Federal income tax purposes.  In the process of computing corporate Federal income tax under the completed contract method, GENDYN, under section 1.451-3(d)(5)(iii), Income Tax Regs., elected to expense rather than capitalize certain period expenses.  Normally, under the completed contract method, the income and expenses connected with long-term contracts are not reported or claimed until the completion of the contract.

In computing the allowable amount of deferral or exclusion of DISC or FSC commission income, petitioners did not include the period costs that were deducted in prior years' domestic Federal

income tax computations (prior year period costs).  Instead, in computing the amount of foreign sales corporation commission income to be deferred or excluded, petitioners used only the period costs incurred in the year of completion (current period costs) and allocated to the particular contract under section 1.451-3(d)(5)(iii), Income Tax Regs.

Respondent determined that petitioners' approach resulted in a permanent exclusion and/or distortion in the form of exaggerated amounts of deferral or exclusion of DISC or FSC income because of an understatement of the amount of cost.  The additional deferral or exclusion claimed by petitioners, in respondent's view, does not harmonize with Congress' intent.  The parties, to a great degree, rely on the same statutes and regulations but arrive at opposite conclusions.  First, we analyze the pertinent statutory and regulatory material.

A.  Statutory Background and Framework for DISC's and FSC's

In 1971, Congress enacted[3] the DISC provisions[4] as a tax incentive to encourage and increase exports.  The legislation allowed domestic corporations to defer taxes on a significant portion of profits from export sales similar to the tax benefits available to corporations manufacturing abroad through foreign

---

[3] Revenue Act of 1971, Pub. L. 92-178, sec. 501, 85 Stat. 497, 535.

[4] Secs. 991-997.

subsidiaries.  H. Rept. 92-533, at 58 (1971), 1972-1 C.B. 498, 529; S. Rept. 92-437, at 90 (1971), 1972-1 C.B. 559, 609.  A domestic corporation that conducts its foreign operations through a foreign subsidiary generally does not pay domestic Federal tax on the income from those operations until the subsidiary's income is repatriated to the domestic parent.

In 1984, Congress enacted the FSC provisions[5] to replace and cure some shortcomings in the DISC provisions.  Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 801(a), 98 Stat. 494, 990; S. Rept. 98-169, at 636 (1984).  Under the FSC provisions, a taxpayer may permanently avoid Federal income tax on a portion of its profits on qualifying export sales.

The DISC and FSC provisions reallocate income generated by export sales from the parent corporation to its DISC or FSC. DISC's are generally not subject to tax.  Sec. 991.  However, the parent corporation is taxed on a specified portion of the DISC profits as a deemed distribution.  Sec. 995; L & F Intl. Sales Corp. v. United States, 912 F.2d 377, 378 (9th Cir. 1990).  The remaining profits are tax-deferred until distributed (repatriated) to the parent or until the corporation ceases to qualify as a DISC.  Secs. 995(a) and (b) and 996(a)(1).  The FSC provisions permanently exempt a portion of FSC profits from tax. Sec. 923(a).  The amount of the deferral or exemption is in

---

[5] Secs. 921-927.

controversy here.  For purposes of this case, the DISC and FSC provisions are generally similar, and the parties do not argue that the outcome should vary depending on which of the provisions apply.

The focus here is whether petitioners must consider period costs attributable to the gross receipts from export sales of the foreign sales corporation, even though the period costs were deducted in prior years.  There is a direct relationship between the quantity of DISC income and the tax benefit available to a domestic corporation under the DISC provisions.  The greater the costs allocated to export sales, the lower the combined taxable income attributable to the DISC or FSC, and thus the smaller the tax deferral or exclusion.

Ordinarily, taxpayers seek ways to reduce the amount of their reportable income, such as by means of deductions.  In computing combined taxable income (CTI) of a foreign sales corporation, however, taxpayers benefit where the amount of export sales is larger or maximized to take advantage of the congressionally intended deferral or exclusion of income.  We are therefore presented with the somewhat unusual circumstance where petitioners argue that the amount of income should be larger, and respondent argues it should be smaller.  Petitioners assert that they should not be required to reduce CTI by the portion of their costs that was deducted in prior years.

B.  Allocation of Income From Export Sales to DISC's

1.  Statutory Requirement

Under the DISC provisions, Congress created intercompany pricing rules for the purpose of limiting the amount of income that the parent can allocate to the DISC and thereby limiting the amount of tax incentive by means of income deferral.  The pricing rules provide for the price at which the parent corporation is deemed to have sold its products to the DISC, regardless of the price actually paid.  Bently Labs., Inc. v. Commissioner, 77 T.C. 152, 163 (1981).  Section 994(a) provides three alternative pricing methods for DISC's:  (1) 4 percent of qualified export receipts on the sale of export property; (2) 50 percent of the combined taxable income of the DISC and its related supplier (the parent corporation); or (3) the arm's-length price, computed in accordance with section 482.[6]  Taxpayers may use the method that produces the largest amount of income allocation to the DISC's.  Similarly, section 925 provides three pricing methods for FSC's:  (1) 1.83 percent of foreign trading gross receipts; (2) 23 percent of combined taxable income; and (3) the arm's-length price, computed in accordance with section 482.  Sec. 925(a).  The CTI methods are at issue in this case.

---

[6] Under the first two methods, the DISC is entitled to include 10 percent of its export promotion expenses as additional taxable income.  Sec. 994(a)(1) and (2); sec. 1.994-1(a)(1), Income Tax Regs.

The parent corporation either sells its product to the DISC for resale in foreign markets, a buy-sell DISC, or pays a commission to the DISC for selling goods in foreign markets, a commission DISC. Brown-Forman Corp. v. Commissioner, 94 T.C. 919, 926 (1990), affd. 955 F.2d 1037 (6th Cir. 1992). The DISC in this case is a commission DISC. Although the section 994(a) pricing rules literally apply only to a buy-sell DISC, they have been adopted for commission DISC's pursuant to statutory authority granted to the Secretary. Sec. 994(b)(1); sec. 1.994-1(d)(2)(i), Income Tax Regs.; see sec. 925(b)(1); sec. 1.925(a)-1T(d)(2), Temporary Income Tax Regs., 52 Fed. Reg. 6447 (Mar. 3, 1987). In the case of a commission DISC, CTI is computed using the gross receipts on the sale, lease, or rental of the property on which the commissions arose. Sec. 993(f).

2. Regulatory Requirement

CTI equals the excess of the DISC's gross receipts from export sales over the total costs of the DISC and the parent that relate to the DISC's gross receipts. Sec. 1.994-1(c)(6), Income Tax Regs.; see sec. 1.925(a)-1T(c)(6)(i), Temporary Income Tax Regs., 52 Fed. Reg. 6446 (Mar. 3, 1987). Section 1.994-1(c)(6), Income Tax Regs., provides rules for determining which costs relate to export sales:

> In determining the gross receipts of the DISC and the total costs of the DISC and related supplier which relate to such gross receipts, the following rules shall be applied:

(i) Subject to subdivisions (ii) through (v) of this subparagraph, the taxpayer's method of accounting used in computing taxable income will be accepted for purposes of determining amounts and the taxable year for which items of income and expense (including depreciation) are taken into account.  * * *

(ii) Costs of goods sold shall be determined in accordance with the provisions of section 1.61-3 [Income Tax Regs.].  See sections 471 and 472 and the regulations thereunder with respect to inventories. * * *

(iii) Costs (other than cost of goods sold) which shall be treated as relating to gross receipts from sales of export property are (a) the expenses, losses, and other deductions definitely related, and therefore allocated and apportioned, thereto, and (b) a ratable part of any other expenses, losses, or other deductions which are not definitely related to a class of gross income, determined in a manner consistent with the rules set forth in section 1.861-8 [Income Tax Regs.].

See sec. 1.925(a)-1T(c)(6)(iii), Temporary Income Tax Regs., 52 Fed. Reg. 6446 (Mar. 3, 1987).

3.  Application of Regulations by the Parties

Petitioners contend that subdivision (i) of the regulation requires the computation of CTI in accordance with the method they use to account for domestic taxable income.  Section 1.451-3(d)(5)(iii), Income Tax Regs., permits a variation from the completed contract method for electing taxpayers to currently deduct period costs even though the related income is not reportable until a later taxable year when the contract is completed.  Due to their election to currently deduct period costs, petitioners argue that, in the year of contract completion, they should not be required to reduce foreign gross

receipts by period costs that were deducted in computing prior years' income taxes. Because they cannot deduct prior year period costs in the years in issue, petitioners contend that those period costs need not be utilized in computing CTI.

Conversely, respondent argues that, in accord with the congressional intent as reflected in the legislative history, the regulations require a taxpayer to account for all costs that relate to export sales, including period costs deducted in prior years. Respondent further argues that petitioners' accounting method and any permissible variations therefrom do not control in determining the statutory limitations for computing CTI. We agree with respondent.

### C. Whether Section 1.994-1(c)(6), Income Tax Regs., Is a Reasonable Interpretation of the Statute

The regulation in controversy was intended to define the statutory phrase "combined taxable income". That phrase is not defined in the Internal Revenue Code. The regulation promulgated by the Secretary is couched in broad terms, leaving room for the parties to advance differing interpretations. In this regard, petitioners have not questioned the validity of the regulation under consideration. The regulatory formula for CTI is the "excess of the gross receipts * * * over the total costs * * * which relate to such gross receipts." Sec. 1.994-1(c)(6), Income Tax Regs. The regulation also provides that the taxpayer may in certain circumstances use the same method of accounting in

computing CTI as used during the taxable year for which CTI is being computed. Sec. 1.994-1(c)(6)(i), Income Tax Regs.

The term "total costs" is ambiguous and does not delineate whether the "total" is for the year, as petitioners contend, or all costs relating to the gross receipts, including those incurred and deducted in a prior year. Accordingly, petitioners and respondent are both placed in the position of advancing, for purposes of this litigation, their respective interpretations of the language of the regulation.

Normally, we defer to regulations which "implement the congressional mandate in some reasonable manner." United States v. Vogel Fertilizer Co., 455 U.S. 16, 24 (1982) (quoting United States v. Correll, 389 U.S. 299, 307 (1967)); Rowan Cos., Inc. v. United States, 452 U.S. 247, 252 (1981); National Muffler Dealers Association, Inc. v. United States, 440 U.S. 472, 476 (1979).[7]

---

[7] The deference given to a regulation depends on the source of authority under which the Secretary promulgated it. Less deference is given to a regulation promulgated under the general authority of sec. 7805(a), an interpretative regulation, and greater deference to a regulation promulgated under a specific statutory grant of authority, a legislative regulation. United States v. Vogel Fertilizer Co., 455 U.S. 16, 24 (1982).

Pursuant to sec. 994(b)(1), the Secretary issued sec. 1.994-1(d), Income Tax Regs., which subjects commission DISC's to the pricing rules set forth in sec. 994(a). See sec. 1.925(a)-1T(d), Temporary Income Tax Regs., 52 Fed. Reg. 6447 (Mar. 3, 1987). Sec. 1.994-1(d)(2), Income Tax Regs., refers to par. (c) of that regulation for the proper method to apply the pricing rules. However, that reference may not automatically make par. (c) a legislative regulation when applied to commission DISC's. Congress did not specifically grant the Secretary authority to promulgate regulations with regard to buy-sell DISC's.

(continued...)

Respondent's litigating position is not afforded any more deference than that of petitioners. By way of example, proposed regulations and revenue rulings are generally not afforded any more weight than that of a position advanced by the Commissioner on brief. Laglia v. Commissioner, 88 T.C. 894, 897 (1987); Estate of Lang v. Commissioner, 64 T.C. 404, 407 (1975), affd. in part and revd. in part 613 F.2d 770 (9th Cir. 1980). That is especially so here, where respondent did not publish her position prior to this controversy. Accordingly, we proceed to decide which party's approach harmonizes with the statutory intent.

Section 994(a)(2) presents the somewhat ambiguous and completely undefined term "combined taxable income." The regulation in question does not conflict with the language of the statute it interprets. In addition, the regulatory definition of costs related to export sales is consistent with legislative history, which states:

> the combined taxable income * * * would be determined by deducting from the DISC's gross receipts the related person's cost of goods sold with respect to the property, the selling, overhead and administrative expenses of both the DISC and the related person which

[7](...continued)
Subdivision (iii) of sec. 1.994-1(c)(6), Income Tax Regs., applies equally to buy-sell DISC's and commission DISC's.

Accordingly, portions of the regulation in question may be legislative or interpretative or a mix of legislative and interpretative elements. The parties' disagreement, however, does not focus on the source of the Government's authority for issuance of the regulation in question, and it is unnecessary to decide whether the regulation in question is interpretative, legislative, or a mixture of both.

> are <u>directly related to the production or sale of the export property and a portion of the related person's and the DISC's expenses not allocable to any specific item of income</u>, such portion to be determined on the basis of the ratio of the combined gross income from the export property to the total gross income of the related person and the DISC. [Fn. ref. omitted; emphasis added.]

H. Rept. 92-533, at 74 (1971), 1972-1 C.B. 498, 538; S. Rept. 92-437, at 107 (1971), 1972-1 C.B. 559, 619. The regulation in issue defines an ambiguous term and reflects congressional intent as to the types of costs taxpayers must allocate to export sales in calculating CTI. Thus, the regulatory definition of CTI in section 1.994-1(c)(6), Income Tax Regs., is a reasonable interpretation of section 994.

D. Interpretation of the Regulatory Definition of "Combined Taxable Income"

Regulations that are valid exercises of the powers of the Secretary have the force and effect of law. <u>Sim-Air, USA, Ltd. v. Commissioner</u>, 98 T.C. 187, 198 (1992). The rules for interpreting a valid regulation are similar to those governing the interpretation of statutes. <u>KCMC, Inc. v. FCC</u>, 600 F.2d 546, 549 (5th Cir. 1979); <u>Intel Corp. & Consol. Subs. v. Commissioner</u>, 100 T.C. 616, 631 (1993), affd. 67 F.3d 1445 (9th Cir. 1995). When construing a statute, or in this case a regulation, we are to give effect to its plain and ordinary meaning unless to do so would produce absurd results. <u>Green v. Bock Laundry Mach. Co.</u>, 490 U.S. 504, 509 (1989); <u>Exxon Corp. v. Commissioner</u>, 102 T.C.

721 (1994).  The most basic tenet of statutory construction is to begin with the language of the statute itself.  United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989).  When the plain language of the statute is clear and unambiguous, that is where the inquiry should end.  Id.  Where a statute is silent or ambiguous, we look to legislative history to ascertain congressional intent.  Peterson Marital Trust v. Commissioner, 102 T.C. 790, 799 (1994), affd. 78 F.3d 795 (2d Cir. 1996).  We apply these rules to interpret the regulations promulgated under section 994.

An integral part of calculating CTI is determining the costs of the export sales.  Sec. 1.994-1(c)(6), Income Tax Regs.  The regulations under section 994 require taxpayers to account for the "total costs" related to export sales.  Sec. 1.994-1(c)(6), Income Tax Regs.; see sec. 1.925(a)-1T(c)(6)(ii), Temporary Income Tax Regs., 52 Fed. Reg. 6446 (Mar. 3, 1987).  Total costs include costs that definitely relate to the export sales and a ratable share of costs that do not definitely relate to any class of gross income.  Sec. 1.994-1(c)(6)(iii), Income Tax Regs.; see sec. 1.925(a)-1T(c)(6)(iii)(D), Temporary Income Tax Regs., supra.  Thus, taxpayers must allocate their costs between export sales and domestic sales to compute CTI.  Sec. 1.994-1(c)(6)(iii), Income Tax Regs.; see sec. 1.925(a)-1T(c)(6)(iii)(D), Temporary Income Tax Regs., supra.

Rather than creating a new method of cost allocation within the DISC provisions, Congress intended that taxpayers use the method for allocating costs under section 1.861-8, Income Tax Regs. The intended method for allocating expenses in the CTI computations appears consistent throughout the legislative history of the DISC provisions, which states:

> the combined taxable income from the sale of the export property is to be <u>determined generally in accordance with the principles applicable under section 861</u> for determining the source (within or without the United States) of the income of a single entity with operations in more than one country. These rules generally allocate to each item of gross income all expenses directly related thereto, and then apportion other expenses among all items of gross income on a ratable basis. * * * [Emphasis added.]

H. Rept. 92-533, <u>supra</u> at 74, 1972-1 C.B. at 538; accord S. Rept. 92-437, <u>supra</u> at 107, 1972-1 C.B. at 619. Consistent with legislative history, the regulations provide that taxpayers must allocate and apportion their costs (other than costs of goods sold) "in a manner consistent with the rules set forth in § 1.861-8." Sec. 1.994-1(c)(6)(iii), Income Tax Regs.; see sec. 1.925(a)-1T(c)(6)(iii)(D), Temporary Income Tax Regs., <u>supra</u>.

In general, section 1.861-8, Income Tax Regs., provides geographic sourcing rules to allocate and apportion expenses between the United States and foreign countries. It also provides rules for determining taxable income from specific activities and for allocating income and deductions to those activities under other sections of the Code referred to as

"operative sections". Sec. 1.861-8(a)(1),(f)(1)(i)-(vi), Income Tax Regs. Operative sections define the categories of income between which taxpayers must allocate their deductions and gross income.

Section 994 is an operative section wherein income is grouped into two categories; i.e., income from export sales, referred to as the statutory grouping, and all remaining gross income, referred to as the residual grouping. St. Jude Medical, Inc. v. Commissioner, 97 T.C. 457, 465 (1991), affd. in part and revd. in part and remanded 34 F.3d 1394 (8th Cir. 1994); sec. 1.861-8(f)(1)(iii), Income Tax Regs. Under section 1.861-8, Income Tax Regs., taxpayers must allocate their deductions to a class of gross income and, then, if necessary to make the determination required by the operative section, apportion the deductions within the class of gross income between the statutory and residual groupings. Sec. 1.861-8(a)(2), Income Tax Regs. The apportionment must be accomplished in a manner that reflects to a "reasonably close extent" the factual relationship between the deduction and the income grouping. Sec. 1.861-8(c)(1), Income Tax Regs.

Similar to the related costs definition in section 1.994-1(c)(6)(iii), Income Tax Regs., section 1.861-8, Income Tax Regs., requires allocation of deductions to definitely related classes of gross income. Any deductions that do not definitely relate to a class of gross income are ratably apportioned to all

gross income based on the ratio of gross income from each class to the taxpayer's total gross income. Sec. 1.861-8(a)(2), (b)(1), and (c)(3), Income Tax Regs. A cost is "definitely related" to a class of gross income if it is incurred as a result of, or incident to, an activity or in connection with property from which that class of gross income is derived. Sec. 1.861-8(b)(2), Income Tax Regs. In general, period costs benefit and relate to the taxpayer's business as a whole and are not incident to or necessary for the performance of a particular contract. McMaster v. Commissioner, 69 T.C. 952, 955 (1978). Thus, period costs are costs that do not definitely relate to any class of gross income, as defined by sections 1.994-1(c)(6)(iii) and 1.861-8, Income Tax Regs., and must be ratably apportioned to all gross income.

Additionally, section 1.861-8, Income Tax Regs., does not distinguish period costs from other costs that relate to export sales. Furthermore, section 1.861-8, Income Tax Regs., does not excuse taxpayers from allocating costs to a class of gross income unless the costs are definitely related to another class of gross income. Section 1.861-8(a)(2), Income Tax Regs., provides: "Except for deductions, if any, which are not definitely related to gross income * * * and which, therefore, are ratably apportioned to all gross income, all deductions of the taxpayer * * * must be so allocated and apportioned." Thus, consistent with the section 994 regulations, section 1.861-8, Income Tax

Regs., requires taxpayers to prove that the prior year period costs definitely relate to gross income from a source other than export sales, which petitioners have failed to do, to avoid having to account for those costs in determining CTI.

The regulations under section 994, which incorporate section 1.861-8, Income Tax Regs., are consistent with the statutory intent and legislative history. By requiring taxpayers to account for all costs incurred to produce export property in calculating CTI, the regulations limit the deferral or exclusion of income to the actual income from foreign sales after considering "total costs". In addition, the regulations do not permit the exclusion of any particular costs, such as prior year period costs, from the computation of CTI, unless the costs definitely relate to a class of gross income other than export sales. Sec. 1.994-1(c)(6), Income Tax Regs.; sec. 1.925(a)-1T(c)(6)(iii), Temporary Income Tax Regs., supra.

Implicit in petitioners' position that they are following the completed contract method is that the total costs are only those claimed in the computation year. Petitioners do not provide us with a logical or reasonable definition of "total costs" and/or "related costs" that would harmonize with the statutory limitation intended by Congress. Nor have petitioners shown that the prior year period costs definitely relate to a class of gross income other than export sales. It has not been argued that the prior year period costs are unrelated to

petitioners' export sales.  In addition, petitioners previously allocated the prior year period costs to particular export sales contracts as they accrued.  Thus, we find that the regulatory definition of related costs includes prior year period costs that have previously been deducted.  Petitioners must account for both current and prior year period costs in determining their CTI.

E.  The Effect of the Taxpayer's Method of Accounting on the Computation of Combined Taxable Income

Petitioners also argue that they are properly applying their method of accounting by not reducing CTI by prior year period costs.  Rather than suggesting an alternative definition of total costs that excludes prior year period costs, petitioners rely on subdivision (i) of section 1.994-1(c)(6), Income Tax Regs.  That subdivision permits taxpayers to use their normal method of accounting in computing CTI.  Petitioners interpret that regulation to require taxpayers to compute CTI in accordance with their method of accounting.  Accordingly, petitioners contend that whether costs related to export sales, as defined in section 1.994-1(c)(6)(iii), Income Tax Regs., are allocable to those export sales for purposes of determining CTI depends on their accounting method.

Section 1.994-1(c)(6)(i), Income Tax Regs., provides:

    (i) Subject to subdivisions (ii) through (v) of
this subparagraph, the taxpayer's method of accounting
used in computing taxable income will be accepted for
purposes of determining amounts and the taxable year

for which items of income and expense (including depreciation) are taken into account.  * * *

See sec. 1.925(a)-1T(c)(6)(iii)(A), Temporary Income Tax Regs., supra.  Use of the taxpayer's accounting method is expressly subject to subdivision (iii)'s definition of related costs that taxpayers must take into account in calculating CTI.  Sec. 1.994-1(c)(6)(i), Income Tax Regs.; see sec. 1.925(a)-1T(c)(6)(iii)(D), Temporary Income Tax Regs., supra.  Thus, section 1.994-1(c)(6)(iii), Income Tax Regs., defines the costs related and allocable to petitioners' export sales; such costs are not defined by petitioners' method of accounting.

In addition to their misplaced reliance on subdivision (i) of section 1.994-1(c)(6), Income Tax Regs., petitioners also assert that section 1.861-8, Income Tax Regs., supports their position that they are not required to account for prior year period costs.  As stated above, Congress intended taxpayers exporting through DISC's to allocate their income and costs to export sales pursuant to the requirements of section 1.861-8, Income Tax Regs.  Rather than address the substantive allocation requirements of section 1.861-8, Income Tax Regs., as described above, petitioners again concentrate their argument on their accounting method.  Petitioners argue that section 1.861-8, Income Tax Regs., requires that the principles of annual accounting apply to income and cost allocations.  Petitioners deducted the period costs in prior years in accordance with the

completed contract method. Therefore, petitioners contend that requiring them to account for the prior year period costs in the year of contract completion to compute CTI is inconsistent with the principles of annual accounting.

Under the principles of annual accounting, a transaction must be accounted for under the taxpayer's method of accounting on the basis of the facts in the year the transaction occurs. Security Flour Mills Co. v. Commissioner, 321 U.S. 281 (1944); Burnet v. Sanford & Brooks Co., 282 U.S. 359 (1931); Landreth v. Commissioner, 859 F.2d 643 (9th Cir. 1988), affg. in part, revg. in part, and remanding T.C. Memo. 1985-413. Section 461(a) requires that a deduction be taken in the taxable year that is proper under the taxpayer's method of accounting.

The completed contract method requires income and deductions from long-term contracts to be reported in the year in which the contracts are completed. Sec. 1.451-3(d)(1), Income Tax Regs. However, section 1.451-3(d)(5)(iii), Income Tax Regs., provides a variation or exception to the requirement that deductions be deferred. A current deduction is allowed, at the taxpayer's election, for period costs. Texas Instruments Inc. v. Commissioner, T.C. Memo. 1992-306; sec. 1.451-3(d)(5)(iii), Income Tax Regs. Period costs include marketing and selling expenses, distribution expenses, general and administrative expenses attributable to the performance of services that benefit the taxpayer's activities as a whole, casualty losses, certain

pension and profit-sharing contributions, and costs attributable to strikes, rework labor, scrap, and spoilage. Sec. 1.451-3(d)(5)(iii), Income Tax Regs.

Petitioners' use of the completed contract method of accounting to report income and deductions for their long-term contracts has not been questioned. This method of accounting provides an alternative to the annual accrual method of accounting for long-term contracts for which the ultimate profit or loss is not ascertainable until the contract is completed. See RECO Indus., Inc. v. Commissioner, 83 T.C. 912, 921 (1984). The method allows a taxpayer to account for the entire result of a long-term contract at one time. Id. The purpose of the completed contract method is to match the costs of generating income with the income produced. In this case, however, petitioners try to use the completed contract method to avoid the matching of costs with income from export sales for purposes of computing CTI as required by the regulations under sections 994 and 925. As a result, petitioners did not subtract all the costs related to their export sales as defined in section 1.994-1(c)(6)(iii), Income Tax Regs., from the export income that the expenditures generated.

The completed contract method of accounting does not necessarily conflict with requiring taxpayers to account for all related period costs in determining CTI. The completed contract method is an accounting method that allocates to a particular

taxable year the items of income and expenses that must be reported within that year. It is relevant only to the timing of deductions and income recognition. RECO Indus., Inc. v. Commissioner, supra at 922. Like other accounting methods, the completed contract method relies on other sections of the Code, such as the DISC provisions, to determine the amount of income to be recognized and the amount of allowable deductions. The purpose of the pricing rules in the DISC provisions is to determine the amount of income that taxpayers engaged in export activities must recognize and the amount of income that is tax deferred. The completed contract method has a different purpose. It determines the taxable year in which a related supplier recognizes the income attributable to export sales, the amount of income to be recognized having been determined by the DISC provisions. Thus, the variations or exceptions to the completed contract method here do not govern which costs are allocable to long-term export contracts for purposes of determining CTI.

In addition, requiring taxpayers to account for prior year period costs in calculating CTI does not interfere with the current deduction allowed for period costs under the completed contract method. Petitioners' interpretation of the completed contract method gives taxpayers benefits in addition to their ability to currently deduct period costs. There is no indication that Congress intended the limitation on deferral or exclusion to promote foreign exports to include a double or extra benefit only

for those taxpayers on the completed contract method who elected to deduct period costs on an annual basis.

Accepting petitioners' argument would mean that taxpayers using the completed contract method of accounting would calculate their CTI in accordance with section 1.451-3, Income Tax Regs., as opposed to the regulations under sections 994 and 925. Under section 1.861-8, Income Tax Regs., the costs to be allocated are defined by the operative section which references that regulation. Thus, we look to sections 994 and 925 and the related regulations to determine which costs are allocable to export sales for purposes of determining CTI, not the regulations under section 451 as petitioners contend. Although period costs are not required to be allocated to long-term contracts for cost-deferral purposes under section 1.451-3(d)(5)(iii), Income Tax Regs., sections 994(a) and 925(a) and the related regulations require that all costs, including prior year period costs, be accounted for in determining CTI.

Requiring petitioners to account for all period costs in determining CTI is consistent with the completed contract method of accounting. Allowing taxpayers to use their normal method of accounting to compute CTI does not necessarily cede to the accounting methodology the computation of the limitation of the benefit to be generated by foreign exports. Petitioners must account for all related costs, including period costs, of both

current and prior years in determining their CTI from export sales.

II.  Regulatory Definition of "Export Property"

Petitioners manufactured two specialized vessels that were designed and built for transoceanic transport of liquefied natural gas.  The tankers were manufactured under contract for sale to a company for direct use outside the United States. After the completion, but before the tankers could be used for foreign purposes, unforeseen delays caused some domestic use of one of the tankers.  The delay also caused both tankers not to be used in foreign commerce prior to 1 year after their sale.

In order for petitioners' DISC to retain its statutory status, 95 percent of its gross receipts must consist of qualified export receipts.  Sec. 993(e).  Qualified export receipts include gross receipts from the sale, exchange, or other disposition of export property.  "Export property" is statutorily defined, in pertinent part, as "property * * * manufactured * * * in the United States by a person other than a DISC, * * * held primarily for sale, * * * in the ordinary course of trade or business * * * for direct use, consumption, or disposition outside the United States".  Sec. 993(c)(1).

The regulations in connection with the definition of "export property" provide for a "destination test".  Property satisfies the destination test "only if it is * * * directly used * * * outside the United States * * * by the purchaser * * * within 1

year after such sale". Sec. 1.993-3(d)(2)(i)(b), Income Tax Regs. Petitioners contend that the destination test of the regulation is not a proper interpretation of the statutory provision and hence is invalid.

We have already addressed the destination test and found valid section 1.993-3(d)(2)(i)(b), Income Tax Regs., in Sim-Air, USA, Ltd. v. Commissioner, 98 T.C. 187, 190-197 (1992). There is nothing in petitioners' argument here that would warrant a change in our reasoning or conclusion concerning the validity of that aspect of the DISC regulations. Petitioners also raise factual distinctions between this case and Sim-Air. Factual differences between cases, however, do not address the question of whether a particular regulation is a proper interpretation of a statutory provision.

Petitioners also argue that they should be relieved of the 1-year destination requirement because of the unforeseen factual circumstances that caused them not to meet the regulation's requirement. The taxpayer in Sim-Air made a similar argument that was rejected. Id. at 197-198. Once a regulation is found valid, it has the force and effect of law. That law (both the statute and the regulation in question here) does not provide any exception for reasonable delay or unforeseen events. Nor is there room to interpret the statute or regulation to permit petitioners' factual circumstances different treatment by means

of a waiter or exemption from the requirement under consideration.

Petitioners also question the validity of other subparts of the export property regulation, but we find it unnecessary to consider that and other positions of the parties because petitioners' failure to satisfy the 1-year test is dispositive of this issue.

To reflect the foregoing,

<u>An appropriate order will be issued reflecting the resolution of the foreign issues in controversy.</u>